### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES | : | |
| | : | CRIMINAL CASE NO. |
| v. | : | 3:20-CR-00085 (JCH) |
| | : | |
| ARMANDO GONZALEZ | : | JANUARY 4, 2022 |
| | : | |

**RULING ON DEFENDANT'S MOTION TO SUPPRESS WIRETAP (DOC. NO. 144)**

## I.      INTRODUCTION

In this multi-defendant criminal case, defendant Armando Gonzalez has moved to suppress "all conversations, text messages, and communications of any kind intercepted from [a] telephone number" known as "Target Telephone One."  See Mot. to Suppress Wiretap at 1 (Doc. No. 144); Mem. in Supp. of Mot. to Suppress Wiretap ("Def.'s Mem.") (Doc. No. 147).  His Motion puts before this court questions of law related to the application of the suppression requirement to text messages, a technology that simply did not exist when either the governing statute was passed by Congress or the principal Supreme Court case on the issue was decided.

The Government has opposed Gonzalez's Motion.  See Gov't Mem. in Opp'n to Def.'s Mot. [to] Suppress ("Gov't Opp'n") (Doc. No. 156).  The court has also held a telephonic conference and a lengthy evidentiary hearing on this matter, in addition to directing the parties to file supplemental Memoranda on discrete factual disputes and legal issues related to Gonzalez's Motion.  For the reasons discussed below, the Motion to Suppress is denied.

## II.   PROCEDURAL AND ALLEGED FACTUAL HISTORY

On June 3, 2020, a grand jury returned a seven-count Indictment charging ten individuals with crimes related to fentanyl distribution.  See Indictment (Doc. No. 35). Gonzalez was charged in Count One and Count Four of the Indictment. In Count One, he was charged with conspiracy to distribute, and to possess with intent to distribute, fentanyl; and in Count Four with possession with intent to distribute 40 grams or more of fentanyl.  Id. at 1-2, 4.  Gonzalez was arraigned on June 24, 2020, on these charges and pleaded not guilty.  See Minute Entry (Doc. No. 57).

According to the Government, the investigation targeting Gonzalez grew out of an investigation of one of his co-defendants in this case.  See Oct. 20, 2021 Hearing ("Hearing").[1]  That co-defendant is alleged to have been located in Mexico, and to have employed several individuals in Connecticut and its surrounding areas who worked on his behalf to distribute narcotics, specifically fentanyl and heroine.  Id.  After tracing the distribution network for these "kilogram quantities" of narcotics, the Government's investigation eventually led to Gonzalez.  Id.  According to the Government, Gonzalez worked closely with another co-defendant in this case, David Cintron, to distribute those drugs in Connecticut.

On November 14, 2019, the Government – relying on an Affidavit from DEA Task Force Officer (TFO) Jeffrey Poulin – applied for authorization to intercept electronic

---

[1] The transcript of the October 20, 2021 Hearing has not been ordered by the parties, and as such does not appear on the docket.  Where the court cites to the Hearing in this Ruling – as well as to the Telephonic Conference in this case held on September 8, 2021 – it therefore does so generally, based on its notes and recollection of the Hearing and the Conference.

communications from Target Telephone One.  See Gov't's Hearing Ex. 1.[2]  Judge

Chatigny signed the Order that same day, and on December 12, 2019, he signed an

expanded Order authorizing the interception of wire communications as well.  Id.;

Gov't's Hearing Ex. 4.  The original Order authorized the Government, subject to certain

restrictions, to intercept communications from Target Telephone One, and listed seven

individual "interceptees" who the Government believed used the phone to further their

illicit activities.  Gov't's Hearing Ex. 1.  This included Gonzalez, as well as Cintron and

"others yet unknown, or not yet fully identified."  Id.  By the time Judge Chatigny signed

the Order renewing the wiretap on January 13, 2020, the list of interceptees related to

Target Telephone One had expanded to thirteen and, in addition to Gonzalez and

Cintron, included Felix Cancel and Gonzalez's girlfriend, Coraima Salgado.  Gov't's

Hearing Ex. 7.  The wiretap was renewed one last time on February 12, 2020, by Judge

Shea, and Gonzalez was soon after arrested on April 28, 2020.  See Gov't's Hearing

Ex. 10; Minute Entry (Doc. No. 8).

On August 4, 2021, Gonzalez filed the instant Motion.  In it, he argues that the

communications intercepted from Target Telephone One – along with "all evidence

developed as a result of th[at] wiretap"[3] – should be suppressed because the

Government failed to minimize "voluminous calls and texts that were personal and

private in nature, and that bore no relation to the [G]overnment's goal of investigating

---

[2] The Government's Exhibits 1-13 for the hearing were provided as hard copies in advance of the hearing.  They do not appear on the docket in electronic form.

[3] At the October 20 hearing, defense counsel clarified that Gonzalez was not certain at that time what additional evidence beyond the intercepted communications should be suppressed if the court were to grant this Motion.  See Hearing.  Defense counsel agreed with the court that the specifics of that question would best be deferred until the court ruled on the instant Motion, and then addressed only if it was granted.

narcotics distribution."  Mot. to Suppress Wiretap at 1.  After the Government filed its Opposition and Gonzalez filed his Reply, the court held a telephonic status conference to determine whether it would be necessary to hold a factual hearing on the Motion. See Gov't's Opp'n; Reply to Gov't's Mem. in Opp'n to Def.'s Mot. to Suppress ("Def.'s Reply") (Doc. No. 163).

During that conference, the court determined that a factual hearing was necessary.  See Minute Entry (Doc. No. 164).  In advance of the hearing, it also ordered Gonzalez to submit a list identifying the specific communications he contends should have been minimized.  Id.  He did so, meticulously reviewing all 2,599 pages of line sheets labeled "pertinent" for Target Telephone One and providing the court with two lengthy charts detailing each individual communication he was challenging and the reasons each one should have been minimized.  See Def.'s Identification of Improperly Minimized Communications – Part I ("Part I – Challenged Communications") (Def.'s Hearing Ex. 31) (Doc. No. 188); Def.'s Identification of Improperly Minimized Communications – Part II ("Part II – Challenged Communications") (Def.'s Hearing Ex. 32) (Doc. No. 189); Def.'s Hearing Ex. 30 ("Line Sheets") (Doc. No. 229) (all 2,599 pages of transcribed communications intercepted from Target Telephone One by the Government).[4]  Of an estimated 2,372 total communications intercepted by the Government and marked as pertinent, Gonzalez challenges approximately 1,806, or 76%, of them.  See Part II – Challenged Communications at 2. He initially divided these

---

[4] Hard copies of defendant's Exhibit 30 were provided to the court in advance of the Hearing, and at the Hearing the court requested that defense counsel provide it with a pdf-searchable version of that 2,599-page document.  See Minute Entry (Doc. No. 193).  They did so in the form of a CD with the pdf on it. Notice of the Manual Filing of that CD was docketed as Doc. No. 229.  However, the 2,599-page pdf of the call and text transcriptions is not itself available on the docket.

communications into two broad categories.  First were the ones he claims were "personal and/or business related."  Id.  These total approximately 1,306 communications, or 55% of all the pertinent communications intercepted by the Government.  See generally Part I – Challenged Communications at 1 (identifying each of the "personal and/or business related calls or texts which were not properly minimized").  The second category includes "calls or texts the nature of which could not be discerned from the line sheets" – in other words, the approximately 500 communications, or 21% of all the pertinent communications, that show up on the line sheets as "gibberish."[5]  See Part II – Challenged Communications at 2; Hearing (describing certain communications challenged by Gonzalez as showing up on the line sheets as "electronic gibberish").

At the hearing, the Government called TFO Poulin, who organized his testimony around a set of Government exhibits.  See October 20, 2021 Hearing Ex. and Witness List (Doc. No. 192).  In particular, TFO Poulin used a PowerPoint presentation to methodically move through each stage of the investigation and provide the Government's explanation for intercepting the challenged communications.  See PowerPoint Presentation, Gov't's Hearing Ex. 14.[6]  According to TFO Poulin and the Government's Supplemental Response filed after the hearing, the challenged

---

[5] The court notes that Gonzalez appears to have double counted approximately 31 phone calls, challenging and listing them in both Part I (Def.'s Hearing Ex. 31) (Doc. No. 188) and Part II (Def.'s Hearing Ex. 32) (Doc. No. 189).  These are the phone calls that he categorizes as "Issue #4" in both filings and asserts were improperly intercepted.  Although these calls appear in both documents, they make up a small percentage of the total number of challenged communications.  As such, the court simply notes the discrepancy, but continues to use the numbers provided by the parties.

[6] Similar to the Government's Exhibits 1-13, the full PowerPoint presentation that constitutes the Government's Exhibit 14 cannot be found on the docket.  Hard copies, however, were provided to the court on the day of the hearing and marked as Exhibit 14 to the Hearing.

communications from Target Telephone One that the Government determined were
pertinent fall into eighteen categories, almost all of which were relevant to the
investigation.  See Gov't's Supp. Resp. Regarding the Def.'s Mot. to Suppress at 1-2, 7
("Gov't's Supp. Resp.") (Doc. No. 208). These include:

A) Pen data from telephone calls included on the line sheets for calls that
were not actually intercepted

B) Communications between Gonzalez and other persons listed as
violators or interceptees in the court Orders

C) Communications with known associates with whom Gonzalez discusses
his illicit activities

D) Communications with unidentified associates where he discusses
information relevant to the investigation

E) Communications with telephone service providers or other
conversations about his telephone use

F) Communications related to Gonzalez's travel through Uber or Lyft

G) Calls less than two minutes in duration

H) Communications – primarily text messages – that are a part of a series
of communications and were needed to decipher the entire conversation

I) Communications related to narcotics activities or stash locations

J) Communications related to firearms

K) Communications about motor vehicle transactions & Gonzalez's
business

L) Communications about financial activities

M) Communications about Gonzalez's location and that of his associates

N) Communications regarding other criminal activity

O) Communications with Felix Cancel

P) Communications where investigators could not determine that they were
not relevant

Q) Communications during the early stages of the wiretap

R)  MMS messages that were effectively minimized

Gov't's Supp. Resp. at 2-8.

Following the hearing, the court also ordered both parties to file supplemental Memoranda on the minimization requirement as it specifically relates to text messages. See Minute Entry (Doc. No. 193).  It also ordered Gonzalez to inform the court if, after having been informed at the hearing of the Government's reasons for intercepting some of the challenged communications, he would be dropping his challenge to any of the 1,806 he had identified in his Motion.  Id.  Gonzalez declined to do so, thus maintaining his Motion to Suppress as it relates to each of the communications he originally challenged.

III.   **THE MINIMIZATION REQUIREMENT**

Although Gonzalez challenges a significant number of intercepted calls, the majority of the communications he contends were not properly minimized are text and MMS messages.  Although the two forms of communications are governed by the same statute and standard, they are in many ways analytically distinct.  And, while the case law assessing Government minimization efforts in the phone call context is well-established, the defendant here represents that "[t]here is neither Supreme Court nor Circuit [precedent] on [the text message] issue", while the Government is not "aware of any generally accepted standard for the minimization of text messages."  Gov't's Supp. Mem. in Opp'n to Def.'s Mot. [to] Suppress at 3 ("Gov't's Text Message Mem.") (Doc. No. 227); Def.'s Mem. of Law Re: Minimization of Text Messages at 1 ("Def.'s Text Message Mem.") (Doc. No. 228).  Below, the court first outlines the long-accepted standard for minimizing phone calls, before applying that framework to the text message context and surveying the scant amount of case law dealing with the issue.

7

A.     Scott and the "Objectively Reasonable" Standard

A defendant moving to suppress intercepted communications for failure to minimize faces a high burden.  Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, provides that the wiretap interception of communications pursuant to a court order "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception."  18 U.S.C. § 2518(5).  If this provision appears to be vague at first glance, that is because it is: as one commentator has noted, "the statute itself does not say" what the Government must do to comply with the minimization requirement.  Seth M. Hyatt, Note, Text Offenders: Privacy, Text Messages, and the Failure of the Title III Minimization Requirement, 64 Vand. L. Rev. 1347, 1348 (2011).

"[T]he terse language of the minimization requirement", coupled with "the absence of any detailed legislative history", meant that in the decade following the enactment of Title III, courts struggled to come to a unified position as to what, precisely, it entailed.  Id. at 1358.  However, in 1978, the Supreme Court decided Scott v. United States, 436 U.S. 128 (1978), articulating a standard for interpreting the minimization requirement that courts continue to apply to this day.  Scott involved the Government's interception of all the conversations from the phone of a person suspected of being part of a widespread conspiracy to import and distribute narcotics. Scott, 436 U.S. at 130-31.  After the Government admitted that it "purposeful[ly] fail[ed]" to adhere to the minimization requirement while surveilling the phone, the District Court "suppressed all intercepted conversations and evidence derived therefrom."  Id. at 131. The District Court also "relied in large part on the fact that virtually all the conversations

were intercepted while only 40% of them were shown to be narcotics related."  Id. at 132.

The Supreme Court, however, disagreed and held that the minimization requirement had not been violated.  In doing so, it stressed that its Fourth Amendment jurisprudence had always "emphasized the objective aspect of the term 'reasonable.'" Id. at 137.  As such, the District Court's focus on the Government's failure "to make good-faith efforts to comply with the minimization requirement" was in error.  Id. at 136. What mattered, instead, was "an objective assessment of [the] officer's actions in light of the facts and circumstances then known to him."  Id.

The Scott court proceeded to highlight several factors that it believed could be useful in determining whether an intercepting agent's actions were objectively reasonable in light of "the facts and circumstances of each case."  Id. at 140.  First, it made clear that "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer."  Id.  This was because "[t]he statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations."  Id.  Percentages, therefore, "may provide assistance, but there are . . . cases, such as [Scott], where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable."  Id.

Second, the court noted that because it was prescribing an "ad hoc", case-specific methodology for determining reasonableness, "there can be no inflexible rule of law which will decide every case."  Id. at 139.  As such, it pointed to other factors that courts should also take into account.  Id. at 140.  These included: (1) the length of the

call; (2) whether it was a one-time call, and; (3) whether it was "ambiguous in nature or apparently involved guarded or coded language." Id.  Where a call was particularly short, was a one-time call, or involved ambiguous or coded language, "agents [could] hardly be expected to know that the call[ ] [was] not pertinent prior to [its] termination." Id.

Moreover, the "circumstances of the wiretap" and the investigation writ-large should also inform a court's assessment.  Id.  For example, agents have more leeway: (1) "when the investigation is focusing on what is thought to be a widespread conspiracy" because "more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise", and; (2) "[d]uring the early stages of surveillance [when] the agents may be forced to intercept all calls to establish categories of nonpertinent calls."  Id. at 141.

 Subsequent cases within this Circuit have further refined this ad hoc, case-specific approach.[7]  For instance, in assessing the interplay between the length of a call and the minimization requirement, one District Court has described the Second Circuit's approach as "generally . . . not extend[ing] [the minimization requirement] to calls lasting two minutes or less.  Stern, 2017 WL 1476149, at *6 (citations omitted).  Although the Second Circuit had fully excluded calls under the two-minute threshold from consideration in United States v. Bynum, 485 F.2d 490 (2d Cir. 1973), vacated and

---

[7] Courts in this Circuit have also employed burden-shifting in analyzing motions to suppress wiretap evidence for failure to minimize.  See, e.g., United States v. Stern, No. 16-CR-525, 2017 WL 1476149, at *6 (S.D.N.Y. Apr. 22, 2017) (articulating "several measures which the government can take to increase the likelihood of compliance with § 2518(5)" and stating that, "[i]f the Government can make a prima facie showing that it undertook steps to increase the likelihood of compliance with § 2518(5), the burden shifts to the defendant to show that a substantial number of non-pertinent conversations were nevertheless unreasonably intercepted"); see also Def.'s Mem. at 4.  Because the Government has taken such steps here, the court concludes the prima facie showing has been made.

remanded on other grounds, 417 U.S. 903 (1974), it clarified in 2015 in Drimal v. Tai, 786 F.3d 219, 225 (2d Cir. 2015), that it had not created a per se two-minute rule. Conceding that its decision in Bynum could "be read to suggest a presumption that calls less than two minutes long need not be minimized", it clarified that "this [was] not a fixed rule for every case: whether the two-minute presumption applies is a fact-specific determination."  Id. at 226.  At least in circumstances "where agents could determine in seconds that the calls . . . were entirely personal in nature", the "two-minute presumption . . . does not automatically shield defendants against the failures to minimize calls under two minutes."  Id.

The Second Circuit has also expressed an increased willingness to defer to law enforcement agents in circumstances where they are investigating a widespread narcotics conspiracy and the calls in question involve "the use of code words and cover-up jargon" that "make [the] investigation most difficult."  U.S. v. Manfredi, 488 F.2d 588, 599 (2d Cir. 1973).  In Manfredi, the Government had represented "that 'most' of the 1,595 calls intercepted were deemed to be 'germane' to the narcotics investigation."  Id. In deciding the case, the Second Circuit conducted its own independent "examination of the logs and transcription sheets", and determined that they "[did] not lend credit to [the Government's] testimony."  Id. at 599-600.  Despite this, the court still held that the minimization requirement had not been violated.  The "conspiracy unveiled was a huge business involving millions of dollars' worth of narcotics, numerous distributors and highly complex, surreptitious telephone calls."  Id. at 600.  As such, the court "fail[ed] to see how any detailed screening instructions which could effectively minimize licit telephone interceptions could be devised under these circumstances."  Id.

11

Finally, the Second Circuit has also been reluctant to find that the minimization requirement has been violated in circumstances when, over the course of the investigation, it became clear that "many calls which seemed at the outset to involve purely personal matters later turned out to be narcotics related." U.S. v. Hinton, 543 F.2d 1002, 1012 (2d Cir. 1976). In Hinton, even though the "agents did not strictly adhere to the minimization instructions", the use of coded language and intermingling of personal and narcotics-related conversation led the court to conclude that, because "there was no way to frame screening instructions so as to avoid the taping of some 'innocent' conversations", suppression was not warranted. Id.

In sum, the Scott factors continue to guide courts in this Circuit in assessing the reasonableness of wiretap surveillance and the Government's efforts to minimize non-pertinent conversations. This is not without controversy. As some commentators have noted, each of these factors functions in practice as an "exception to [the] minimization requirement." Hyatt, Text Offenders, at 1375. Stated differently, the Scott factors do not seek to constrict the Government's surveillance capacity: instead, each provides an independent basis for courts to excuse non-minimization in a prescribed set of circumstances. This has led to "[r]eviewing courts [holding] that law enforcement officials engaged in sufficient minimization even when a surprisingly low percentage of calls were appropriately minimized." Daniel L. Passeser, Note, Deterring Title III Minimization Violations: Why Suppression Isn't Enough, 67 N.Y.U. Ann. Surv. Am. L. 277, 281 (2011).

Moreover, technological advances in electronic communications since both Scott and the most recent amendments to Title III have left courts questioning how they

should enforce the minimization requirement in circumstances where, as is the case

here, the majority of the challenged communications are text messages.  For instance,

the "two-minute presumption" that was the focus of <u>Scott</u>, <u>Bynum</u>, and <u>Drimal</u> is patently

"ill-suited for nonverbal communications such as . . . text messages."  Hyatt, <u>Text

Offenders</u>, at 1350.  Nor does section 2518(5) "provide[ ] . . . clear guidance on how to

minimize these new types of messages."  <u>Id.</u>  Indeed, all of the case law cited thus far in

this section has focused exclusively on telephonic conversations.  It is to the developing

case law regarding text communications that the court now turns.

B.    <u>Text Messages</u>

The case law applying the minimization requirement to text messages is scant.

As of 2011, "courts [had] never addressed text-message minimization directly", and in

the decade since the record remains sparse.  <u>Id.</u> at 1367.  But there is at least some

case law grappling with the need to apply a doctrine designed solely for phone calls to

new technologies and methods of communication unforeseen both by Congress when it

drafted and amended Title III and the Supreme Court when it decided <u>Scott</u>.

For instance, two Judges in the District of Maine have held that, in assessing the

percentage of minimized communications during a wiretap, "text messages can be

excluded from [that number] 'given the impossibility of minimizing a text message.'"

<u>U.S. v. Gordon</u>, No. 2:14-CR-69, 2015 WL 1292638, at *6 (D. Me. Mar. 23, 2015)

(quoting <u>U.S. v. Worthy</u>, No: 2:12-CR-135, 2012 WL 3960315, at *3 (D. Me. Sept. 10,

2012)).  This approach has been noted approvingly by at least one other District Court.

<u>See</u> <u>United States v. Rubio-Sepulveda</u>, No. 14-CR-00144, 2016 WL 11642368, at *9 n.

5 (D. Colo. May 18, 2016) (holding that in light of defendant's failure to identify any

particular text message he believed was not properly minimized, it would not "conduct a

minimization analysis with respect to text messages", but noting that the court in <u>Gordon</u> had "found that text messages, much like calls under two minutes, can be excluded from the ratio of minimized calls").

A plain reading of the statute clearly requires some method of minimization in the context of text messages.  Section 2518 provides that the Government may apply for, and a court may enter, an order "authorizing or approving interception of wire, oral, or electronic [e.g. text] communications."  18 U.S.C. § 2518(2).  Paragraph (5) in turn requires that "[e]very order [under this section] . . .  shall be conducted in such a way as to minimize the interception of communications."  18 U.S.C. § 2518(5) (emphasis added).  On its face then, the minimization requirement applies to all categories of "communications" that are authorized to be intercepted under section 2518, and a text message is clearly a "communication" for the purposes of the statute.  Moreover, the statute permits a court to fashion an order approving of <u>only</u> the interception of electronic communications.  And, because "[e]very order" under section 2518 must adhere to the minimization requirement in paragraph (5), it seems clear that text messages would be included in this requirement as well.

Other courts have implicitly accepted this argument, assuming as self-evident that the minimization requirement applies to text messages.  Although the court in <u>United States v. Holland</u>, 41 F. Supp. 3d 82 (D.D.C. 2014), declined to grant a defendant's Motion to Suppress because he had failed to "identif[y] conversations containing non-pertinent information that ought to have been, but were not, minimized", it did note that the Government had taken appropriate steps to comply with the minimization requirement.  <u>Holland</u>, 41 F. Supp. 3d at 102.  Part of its process included

a "technique required [for] all intercepted electronic communications."  Id. at 99.  Such communications were "to first be reviewed by a case agent, who would disclose those communications to the Assistant United States Attorneys, outside law enforcement, defense counsel, or the public, only if [the case agent] found them to be 'pertinent.'"  Id.

Similarly, the court in U.S. v. Neadeau, No. 09-126(1), 2009 WL 2155680 (D. Minn. July 13, 2009), approved of a similar process for minimizing text messages. There, "text messages were intercepted in their entirety, but were provided to a separate group of text monitoring agents for review . . . [who] were not otherwise involved in the investigation."  Those agents "would [then] determine whether a particular text message was pertinent or privileged", and "[o]nly pertinent, nonprivileged text messages were forwarded to the investigation team.  In turn, any nonpertinent or privileged text messages were secured in a sealed envelope, in a locked drawer, and eventually returned to the District Court for safekeeping."  Neadeau, 2009 WL 2155680, at *6.  This procedure for minimizing text messages was deemed "objectively reasonable" by the court.  Id. at 12.

Both Holland and Neadeau treat the application of the minimization requirement to text messages as axiomatic – an approach that has been echoed by other courts. See, e.g., United States v. Gordon, 871 F.3d 35, 49 (1st Cir. 2017) (noting that "[w]hen the appellant questioned the accuracy of some of the proffered numbers in arguing for suppression in the court below – contending, for example, that . . . text messages were not minimized – the district court ordered the government to submit additional explanations and more detailed data").  These courts have not, however, conducted in-depth, substantive analyses as to whether the minimization of text messages was

appropriately accomplished; rather, they have instead focused on the Government's procedural mechanisms to ensure such minimization occurred.  This has left the minimization requirement's application to text messages in "an interesting gray area [of] modern surveillance law."  Hyatt, Text Offenders, at 1363.  Still, in this court's view, the requirement to minimize non-pertinent text message communications applies, and as an ever-greater percentage of conversations shift from phone to text, courts will, in cases such as these, be forced to grapple with these questions more and more in the coming years.[8]

C.      Applying Scott to Text Messages

When doing so, these courts will have to map the Scott standard, designed in the days before widespread cell phone use, on to text messages.  For some of the Scott factors, this will be relatively straightforward – for instance, the Supreme Court's overarching instruction to look to "the facts and circumstances of each case" remains the predominant guiding principle.  Scott, 436 U.S. at 140.  Others, such as the "fact-specific determination" as to whether "the two-minute presumption applies", are patently "ill-suited for nonverbal communications such as . . . text messages."  Drimal, 786 F.3d at 225; Hyatt, Text Offenders, at 1350.

However, even if most of the Scott factors cannot be directly applied in the text messaging context, they do provide guidance on how courts should proceed in

---

[8] In their Memoranda, the parties also dispute what the proper remedy would be in the event that the court grants Gonzalez's Motion. Gonzalez argues that "'every communication conducted during th[e] surveillance . . . should be suppressed.'"  See Def.'s Mem. at 12 (quoting United States v. Simels, No. 08-CR-640, 2009 WL 1924746 (E.D.N.Y. July 2, 2009)) (emphasis added).  The Government counters by arguing that wholesale suppression is not warranted, and that if the court does grant Gonzalez's Motion, only the communications that should have been minimized should be suppressed.  See Gov't's Text Message Mem. at 8-9 (Doc. No. 228).  Because the court here finds that the Government did not violate the minimization requirement, it does not reach the remedy question.

conducting their "ad hoc" analysis of whether communications have been properly

minimized.  Scott, 436 U.S. at 139.  For example, there is still a logic to permitting the

Government more latitude while it is in the early stages of a wiretap or it is investigating

a widespread conspiracy.  Id. at 141.  In addition, just as the Supreme Court has held

that it is not unreasonable for investigators to continue listening to a properly intercepted

phone call if the parties are using ambiguous or coded language, investigators also

have more freedom to label coded text messages as pertinent as they attempt to

understand the meaning of the communication.  Id. at 140.  The same is true when the

parties, over text, intermingle personal and narcotics-related conversations.  Hinton, 543

F.2d at 1012.

In its Memorandum on the minimization of text messages, the Government points

to a Ninth Circuit case dealing with the minimization of another form of electronic

communication – fax transmissions.  Gov't's Text Message Mem. at 3 (Doc. No. 228).  It

seems to suggest that the minimization standard applied there could be a helpful analog

to the one that should apply text messages.  Id.  In that case, the Government had

minimized "[f]axes that did not appear to be pertinent [by] plac[ing] [them] into an

envelope", sealing them, and then placing them in a locked drawer.  U.S. v. McGuire,

307 F.3d 1192, 1201 (9th Cir. 2002).  "Although this procedure did not prevent the

monitoring agent and the assistant United States attorney from reading the documents

as part of their preliminary screening, it ensured that other people – government agents,

lawyers, and others – did not read the non-pertinent documents at all.  Moreover, the

procedure ensured that the monitoring agent and the assistant United States Attorney

read the documents only once."  Id.

The defendant in <u>McGuire</u> argued that these procedures should have gone further.  In particular, she noted that, when a phone call is minimized, the standard procedure is to "typically stop listening once it seems that the conversation is not pertinent to the criminal investigation.  After some time passes, typically thirty seconds to two minutes, the officials again will listen to determine whether the conversation has shifted to matters pertinent to the investigation."  <u>Id.</u> at 1201-02.  "Reasoning by analogy", she then argued that a similar process should have been followed for fax transmissions.  <u>Id.</u> at 1202.  "[T]he officers . . . should have looked at each fax transmission with a ruler in hand", she argued, "reading line by line."  <u>Id.</u>  "[O]nce it became apparent that language in a fax was not pertinent, the officials should have skipped about thirty lines and then continued reading, line by line, until they reached the end of the transmission."  <u>Id.</u>

The Ninth Circuit rejected this awkward application of the standard minimization procedures for phone calls to written fax transmissions.  After noting that the legislative history revealed Congress' intent that "'[c]ommon sense'" would dictate how electronic communications were minimized, and that "'the minimization should be conducted by the initial law enforcement officials who review the transcript,'" who would then "'disseminate to other officials only that information which is relevant to the investigation,'" the court concluded that the Government's procedures approved in <u>McGuire</u> were "reasonable . . . to eliminate irrelevant information" and adhere to the minimization requirement.  <u>Id.</u> (quoting S. Rep. No. 99-54, at 30-31 (1986)).

Still, the differences between fax transmissions and text messages are significant enough that a direct application of the <u>McGuire</u> standard to the case at hand here is not

appropriate.  Fax transmissions are generally full documents, often containing multiple pages of text.  They ordinarily – though not always – provide sufficient context to be analyzed on their own, and their relevance to the investigation can therefore be determined in isolation or with minimal reference to other faxes or calls.  In contrast, texts are often sent in short bursts, include only a word or two, and require more context to be fully understood.  For instance, here Gonzalez challenges Session Number 272, which is a text message from Target Telephone One simply saying "Yes."  See Part I – Challenged Communications at 6; Line Sheets at 96.  That text is logged in the line sheets as an individual session – just as a full phone call or a fax transmission would be – yet even reading the entirety of the communication, it is impossible to determine its meaning without further context.  For this reason, intercepted text messages invariably "require[ ] monitors to review a series of text messages – and, in some instances, to review a series of text messages and phone conversations – between [the target telephone] and [an] associate so that the monitor can view and decipher the entire communication" and determine relevancy.  Gov't Text Message Mem. at 7 (Doc. No. 228) (emphasis in original).

In this way, the treatment of each individual text message as a full session in the line sheets obscures the fact that text messages are often best viewed as part of a longer exchange.  Just as investigators are not necessarily required to minimize a call that intermingles conversation about personal and criminal matters, it would not be unreasonable, in some circumstances, for investigators to view a text message conversation that does the same in its entirety, even if that means not minimizing individual messages that are entirely personal in nature.  That being said, because text

messages are received individually, more slowly, and sequentially, the monitoring agent should be capable of minimizing conversations that veer into entirely personal content more quickly than he or she would when listening to a phone conversation.

Taken together, the broad framework of Scott still applies to text messages, yet their unique nature means that courts must assess the reasonableness of the Government's minimization efforts in a different context.  It is to the particular facts and circumstances of this case that the court now turns.

## IV.   ANALYSIS

Gonzalez challenges a total of approximately 1,806 communications, contending that each of them should have been minimized.  By the court's count, roughly 474 of these communications were phone calls,[9] while the rest were text or MMS messages.[10] In response, the Government has created eighteen distinct – though at times overlapping – categories of communications, and proffered explanations for intercepting each category.  Below, the court first analyzes the procedures the Government followed to minimize text and MMS messages.  After concluding that the procedures themselves were reasonable, it moves on to the substance of both the intercepted phone calls and text messages, using the eighteen categories established by the Government to aid its analysis.[11]

---

[9] By defendant's count, there were an estimated 653 total phone calls marked as "pertinent."  Part I – Challenged Communications at 2.  This means Gonzalez is challenging approximately 73% of the total number of intercepted calls deemed to be relevant to the investigation.

[10] This total excludes the approximately 31 calls that were double counted by Gonzalez, as discussed supra note 5.

[11] Gonzalez does not appear to challenge the procedures the Government put in place to minimize phone calls, instead focusing on the fact that those procedures were "sparingly used" and, as a result, the calls were not properly minimized overall.  Def.'s Mem. at 16.  As such, the court does not address those procedures further.

A.     <u>Text and MMS Message Minimization Procedures</u>

The Government first received a court Order authorizing it to intercept the electronic communications of Target Telephone One on November 14, 2019.  <u>See</u> Gov't's Hearing Ex. 1.  Although the telephone was subscribed to one of Gonzalez's co-defendants in this case, it was at the time and throughout the investigation believed to be used by Gonzalez.  <u>Id.</u>  The same day Judge Chatigny signed the Order, Assistant United States Attorney Geoffrey M. Stone sent a Memorandum entitled "Minimization Instructions" to the agents monitoring those communications.  <u>See</u> Gov't's Hearing Ex. 2.  "All agents, officers and interpreters ('monitors')" were required to "read the wiretap affidavit, application, order, and [the Minimization Instructions Memorandum] before serving as a monitor", and then certify that they had read those materials.  <u>Id.</u> at 1.

"With regard to the text messag[es]" and MMS messages received on Target Telephone One, the Minimization Memorandum included the following instructions:

> "[A]ll text or electronic messages will be reviewed, in the first instance, by one or more monitoring agents, who will read all of the messages.  The monitoring agents then will review the contents of messages in accordance with the minimization requirements . . . and will forward only the pertinent, non-privileged passages to the rest of the agents and prosecutors.  The monitoring agents will be instructed not to pass minimized information to the other agents or prosecutors.  The minimized messages will be retained and filed under seal with the Court."

<u>Id.</u> at 2.  These same instructions continued to appear in the subsequent Minimization Memoranda sent to monitoring agents after each reauthorization of the wire intercepts, including after the Order was expanded to include phone calls.  <u>See</u> Gov't's Hearing Ex. 5 at 6; Gov't's Hearing Ex. 8 at 6-7; Gov't's Hearing Ex. 11 at 6-7.

Still, despite these clear instructions, the Government has had an unusual amount of difficulty in making representations to the court about the number of text

messages that were minimized during the surveillance of Target Telephone One.  In its progress reports to the court while the wiretap was in place, the Government listed the amount of phone calls it minimized, but never the total amount of communications, texts, or MMS messages.  See, e.g., Gov't Hearing Ex. 6 at 1; Gov't Hearing Ex. 9 at 2; Gov't Hearing Ex. 12 at 2.  When asked how many text messages it minimized over the course of the wiretap at the September 8, 2021 telephonic conference, the Government was unable to answer, but indicated it would double-check that data and provide it at the hearing.  See September 8, 2021 Telephonic Conference ("Telephonic Conference").  Yet at the hearing, the Government could only represent that 60 communications had been minimized, but could not break those down into how many were calls and how many were texts.

Finally, in its Supplemental Response Memorandum and TFO Poulin's accompanying Affidavit, the Government now represents that all of the 60 communications it referred to at the hearing were calls and that, in addition to those communications, it minimized 154 text messages and "effectively minimized" the MMS messages challenged by Gonzalez.  See Gov't Supp. Resp. at 1-2, 7.  While the text messages were presumably minimized by the monitoring agents pursuant to the instructions in the Minimization Instruction Memorandum, the MMS messages appear to have followed a more circuitous route and were "effectively minimized" for the simple reason that the technology the Government uses to intercept electronic communications in the first instance is not actually capable of viewing them.  According to TFO Poulin, the office where the intercepted messages from Target Telephone One were first read contains only what are known as "T2S2 computers."  Aff. of Jeffrey Poulin at ¶ 4 (Doc.

No. 208-1).  "[W]hen a standard text message is first intercepted, the . . . monitoring agents can view the contents of [that] message" on the T2S2 computer, and then "determine[ ] if the text message should be marked pertinent or non-pertinent to the investigation" before either "shar[ing] [it] with the investigative team or minimiz[ing]" it. Id. at ¶ 5.  Simple enough.  But when "a text message with an attached file, such as a picture, a video, an emoji or a website link" – in other words, an MMS – is intercepted, things would get complicated.  Id. at ¶ 3.  In those instances, the monitoring agents opening the message on the T2S2 computer would see only "gibberish", or an "undiscernible string of alpha-numeric digits" that were meaningless to the agent other than to alert him or her to the fact that the "text message [was] in fact an MMS message."  Id. at ¶ 6.

In order to actually view the contents of an MMS message, the monitoring agent would then have to "log[ ] onto a separate stand-alone computer that runs a program called 'Coolminer,'" which is capable to actually deciphering the message.  Id.  This process was further complicated by the fact that: (1) only a "select group" of monitoring agents had access to Coolminer, and (2) the wiretap was often "extremely busy", with "numerous wire and electronic communications being intercepted on an ongoing basis." Id. at ¶ 8.  In those circumstances, it was not always practical for an agent with access to Coolminer to leave his or her station, log into the separate computer, and view the message in real time.  Id.  Instead, the practice that developed among the agents was to mark the "gibberish" message as "pertinent" when it came in on the T2S2 computer, which would then allow an agent to review it on the separate computer later on when

time allowed.  Id.  It is for this reason that so many of the "gibberish" messages are marked as "pertinent" and appear on the line sheets.[12]

Once viewed, however, TFO Poulin avers that, "[t]o the best of [his] knowledge, there were no relevant or pertinent MMS messages that were intercepted, and no MMS messages were [ever] disseminated to the investigative team."  Id. at ¶ 9.  Because of the happenstance process in which these non-pertinent messages were kept separate from the others (viewed only by the agent accessing the Coolminer program and never disseminated to the investigative team), the Government argues that they were "effectively minimized."  Id. at ¶ 11.[13]  This is because, even "[i]f the monitoring agents had minimized the[ ] MMS messages, the same limited members of the investigative team who actually viewed [them] . . . would have been the same", and in both cases they would not have been forwarded along to the investigative team.  Id. at ¶ 14.  In other words, while Gonzalez argues these messages should have been minimized, the Government responds by saying that they effectively were.

The court agrees with the Government that it did not violate the minimization requirement in this instance. However, it does so with some question about the implementation of their procedures. First, it agrees with the Government that the instructions for minimizing text messages in the Minimization Instructions Memorandum were proper and well-constructed, and similar to what other courts have determined are

---

[12] TFO Poulin also states that, after the MMS messages were reviewed on Coolminer, the monitoring agent should have gone back to the T2S2 computer and changed the categorization on those messages to "non-pertinent."  Id. at ¶ 9.  Of course, that did not happen.  Id.

[13] In addition, "at the conclusion of the authorized period of interception, all of the MMS messages intercepted during the authorized period were burned onto a digital disc (i.e., a DVD-R or CD-R disc) and the digital disc was sealed in a DEA evidence bag in the presence of Judge Chatigny or Judge Shea, who signed the sealed portion of the DEA evidence bag."  Id. at ¶ 11.

sufficient to "me[et] the required procedural safeguards."  See, e.g., Holland, 41 F.

Supp. 3d at 99 (reaching that conclusion after reviewing a minimization technique that

"required all intercepted communications to first be reviewed by a case agent, who

would disclose those communications to the Assistant United States Attorneys, outside

law enforcement, defense counsel, or the public, only if he or she found them to be

'pertinent'"); see also Neadeau, 2009 WL 2155680, at *6, 12 (finding "objectively

reasonable" a process where "text messages were intercepted in their entirety, but were

provided to a separate group of text monitoring agents for review . . . [who] were not

otherwise involved in the investigation . . . . [Those agents] would [then] determine

whether a particular text message was pertinent or privileged", and "[o]nly pertinent,

nonprivileged text messages were forwarded to the investigation team.  In turn, any

nonpertinent or privileged text messages were secured in a sealed envelope, in a

locked drawer, and eventually returned to the District Court for safekeeping").

That being said, the Government's continued inability to tell this court, after

repeated inquiries, how many text messages were minimized throughout the course of

the investigation stands in stark contrast to its easy recall of the number of minimized

calls and suggests that, in practice, agents were less concerned with minimizing text

messages than they were calls.  In addition, the ad hoc way in which the Government

backed its way into "effectively minimizing" the MMS messages in this case could be

organized and planned to be handled more efficiently and indicates that its processes

for ensuring that the minimization requirement is met for electronic communications is

underdeveloped.  In some ways, this is perhaps understandable – there is certainly a

lack of clear legal precedent in cases as to what, exactly, the Government must do to

minimize text messages.  Yet the obligation is still on the Government to ensure it is able to "minimize the interception of communications not otherwise subject to interception" each time it conducts a wiretap.  18 U.S.C. § 2518(5).  Absent effective procedures to ensure this is the case, the Government risks running afoul of the minimization requirement in the future.

Still, despite these shortcomings, the court concludes that the procedures the Government followed did not violate the requirement here.  The instructions to the agents about minimizing electronic communications were proper; agents appear to have followed them in minimizing 154 different text messages; and, while the Coolminer "effective minimization" procedure for MMS messages was not fully intentional, it did produce the same end-result as a more streamlined process could have.  See, e.g., Aff. of Jeffrey Poulin at ¶¶ 14-16.  After an objective assessment of the agents' actions, and in light of the facts and circumstances before them at the time, the court cannot conclude that the procedures for minimizing text and MMS messages were unreasonable.  Whether it was reasonable to intercept and mark as pertinent the substantive categories of text messages and phone calls that the parties identify is the question to which the court now turns.

B.    The Substance of the Non-Minimized Text Messages and Phone Calls

The court next addresses the broad categories of communications challenged here by Gonzalez.  Having already concluded that the processes for minimizing text and MMS messages were not unreasonable, the court here addresses those electronic communications together with the challenged phone calls, focusing on whether the substance of those communications should have been minimized.

1.      Pen Data Phone Calls (Category A) and MMS Messages (Category R)

As a preliminary matter, two of the eighteen categories of communications challenged by Gonzalez are easily explained.  First, the Government's Category A includes telephone calls made or received by Target Telephone One before the Government was authorized to intercept calls, i.e., prior to December 12, 2019.  See Gov't's Supp. Mem. at 2-3.  These are recorded as having occurred and are marked as "pertinent" on the line sheets along with the length of the call, even though the line sheets do not include any record of the contents of the call, and the contents of the call were not listened to or recorded.  See, e.g., Line Sheets at 499 (marking as "pertinent" a call from Target Telephone One to one of Gonzalez's co-defendants in this case, but in the synopsis section stating there was "No Audio Recorded"); Hearing.  Gonzalez challenges the interception of this information, saying that these sessions "appear to be intercepted calls without authorization."  Part I – Challenged Communications at 1.  He further speculates about the "information [that was] gleaned from th[ese] call[s]", and whether such information was properly obtained.  Id. at 11.

As the Government points out, however, the interception of this "pen data" was perfectly in line with Judge Chatigny's operative Order during that period.  See Gov't's Hearing Ex. 1 ("the DEA shall install and use a pen register and trap and trace device (including but not limited to 'caller identification') . . . to acquire and collect dialing, routing, addressing, and signaling information associated with each wire or electronic communication to and from the Target Telephone, including . . . source and destination telephone numbers and . . . date, time and duration of all communications").

Gonzalez's confusion with these line sheet entries is understandable, as it is not evident from the sessions themselves what, exactly, had occurred.  The Government's explanation, however, makes clear that these calls were not improperly intercepted.[14]

Similarly, the MMS messages discussed above and classified by the Government as Category R were effectively minimized.  See supra Section IV.A.  These make up the majority of the approximately "500 undiscernible communications" Gonzalez challenges in his Part II submission.  See generally Part II – Challenged Communications (Def.'s Hearing Ex. 32) (Doc. No. 189).  As such, the Government did not violate the minimization requirement as it relates to these MMS messages.

2.      Phone Calls Lasting Less Than 2 Minutes (Category G)

As discussed above, see supra Section III.A, the Second Circuit has made clear that there is no per se two-minute exception to the minimization requirement that applies in every case.  See Drimal, 786 F.3d at 226.  Rather, "whether the two-minute presumption applies is a fact-specific determination" that courts must make on a case-by-case basis.  Id.  In doing so, courts in this Circuit are guided by Bynum, Drimal, and their progeny.  In Bynum, the court assessed a wiretap that "monitored 2,058 calls in a vast narcotics conspiracy case."  Id. at 225.  It then "excluded calls under two minutes from [its] evaluation" because, "'in a case of such wide-ranging criminal activity . . . it would be too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation as merely social or possibly tainted.'"  Id. at

_____

[14] The same is true of the calls in this category that were "made after-hours, that is, calls that were made when the wiretap was not being monitored."  Gov't's Supp. Resp. at 2 (emphasis in original).  As TFO Poulin explained during the Hearing, the wire was in operation from 8:00 A.M. until midnight, and there were no monitoring agents on hand to intercept calls between midnight and 8:00 A.M.  See Hearing.  Calls to or from Target Telephone One during that timeframe were not intercepted, although the pen data from those calls was recorded.  Id.

225 (quoting <u>Bynum</u>, 485 F.3d at 500).  <u>Drimal</u>, decided 42 years later, did not disturb

<u>Bynum's</u> holding, even if it did clarify that the two-minute presumption was not absolute

and had applied there only because of the particular circumstances of that case.

Indeed, the <u>Drimal</u> court took great pains to distinguish the facts of that case from

those in <u>Bynum</u>.  First, the non-minimized phone calls in <u>Drimal</u> involved privileged and

non-pertinent conversations between the defendant and his wife, who was not involved

in the criminal activity being investigated.  <u>Id.</u> at 226.  Second, even though "[m]any of

the violations [ ] took place in the early stages of the wiretap when [the Government]

was less familiar with the case", the monitoring agents "should have realized reasonably

early . . . [that these] deeply personal and intimate . . . conversation[s] [were] privileged

and non-pertinent."  <u>Id.</u> (internal quotations and citations omitted).  Moreover, the Circuit

noted that two agents had "[given] testimony that could be read as acknowledging that

they listened to conversations they knew they should not have."  <u>Id.</u> at 226 n. 6.  Taken

together, these factors meant that "[t]he two-minute presumption [the court] applied in

<u>Bynum</u> [would] not automatically shield" the Government against its failure to minimize

shorter calls.

In his Reply, Gonzalez correctly points out that "[t]here has never been a

wholesale rule relieving federal agents from minimization requirements for

communications under two minutes."  Def.'s Reply at 9.  His arguments that this case is

closer to <u>Drimal</u> than it is <u>Bynum</u> are unavailing.  While it is true that the conspiracy in

<u>Bynum</u> appears to have been more wide-ranging than the one at hand here, the

"sprawling operations of [the alleged] drug ring" in this case "spanned from Mexico to

Connecticut" and "involved numerous co-conspirators", many of whom were still being

identified over the course of the wiretap.  <u>Gordon</u>, 871 F.3d at 48; Gov't's Text Message
Mem. at 5 (Doc. No. 228).  In addition, <u>none</u> of the factors present in <u>Drimal</u> are present
here. Not only was Gonzalez not married at the time, but the investigation revealed that
Gonzalez would discuss criminal activities with his girlfriend, and that she would even
provide aid to those activities in some circumstances.  <u>See</u> Hearing.  It was not
uncommon that the two would intermingle personal and drug-related conversation
either.  <u>Id.</u>  Further, when Gonzalez was talking with other individuals on the phone
during calls that lasted less than two minutes, the identity of the other person would
often either be unknown or be someone investigators suspected of being part of the
criminal conspiracy.  <u>Id.</u>  These conversations frequently included ambiguous and
coded language as well.  <u>Id.</u>  None of this was true in <u>Drimal</u>, at least as it related to the
conversations protected by marital privilege.

Indeed, the circumstances in this case are dramatically different than <u>Drimal</u>.  In
this Circuit, where "[t]he minimization requirement generally does not extend to calls
lasting two minutes or less", it cannot be said that the Government acted unreasonably
in not minimizing these shorter calls.  <u>Stern</u>, 2017 WL 1476149, at *6.  Unlike in <u>Drimal</u>
where the communications were privileged and it was "apparent within seconds" that
the calls were not relevant to the investigation, the complicating factors discussed
above made such quick determinations impossible in this case.  <u>Drimal</u>, 786 F.3d at
226.  Accordingly, after a "fact-specific" inquiry, the court concludes that the two-minute

presumption applies in this case, and that it was not unreasonable for agents to fail to minimize calls that were shorter than that in length.[15]

        3.     Early Stages of the Investigation (Category Q) and Communications with Associates (Categories B, C, D, and O)

Next, the Government identifies in Category Q communications it argues were intercepted early on in the investigation, and therefore they were not required to be minimized.  See Gov't's Supp. Resp. at 7.  It also identifies communications with individuals identified as violators and interceptees in the Orders signed by Judges Chatigny and Shea (Category B); communications with "known associates" where Gonzalez discussed illicit activities (Category C); and communications with "unidentified associates" where he discussed matters relevant to the investigation (Category D).  Id. at 3.  Conversations with Felix Cancel are included in Category B, though the Government also includes a separate category for Cancel (Category O), where it argues that, because the communications with Cancel occurred while he was incarcerated and using an illicit cell phone, it did not have to minimize those conversations because "[e]very call with Cancel [was] evidence of a violation of 18 U.S.C. § 1791, which prohibits the possession or use of cell phones within federal prisons."  Id. at 6.  The court agrees with the Government as to Categories Q, B, C, and D and, because each challenged communication with Cancel is included in Category B and therefore did not need to be minimized, it does not reach the question about whether an alleged violation

---

[15] The court also notes that, as discussed below, it was not unreasonable for the Government to believe that a significant majority of the calls in this category challenged by Gonzalez actually were relevant to the investigation.  Thus, even if the two-minute presumption did not apply, "when viewed as a whole" it still would have been reasonable for agents to intercept these communications.  Stern, 2017 WL 1476149, at *7 (internal quotations and citations omitted).

of section 1791 provides an independent basis for the Government to avoid minimization.

Communications "[d]uring the early stages of surveillance" are often not required to be minimized, at least in circumstances where "the agents may be forced to intercept all [communications] to establish categories of nonpertinent [communications]." Scott, 436 U.S. at 141.  Gonzalez has indicated his belief that most, if not all, of the challenged communications should not be considered to be in the "early stages" of the investigation because of what the Government was able to show in its initial wiretap application.  See Telephonic Conference; Def.'s Reply at 11 (stating that the Government's argument that it was not required to minimize conversations in the early stages of the investigation was "troubling" and "suggests that law enforcement may ignore its statutory and constitutional duty to minimize interceptions of non-pertinent calls in order to hunt for evidence").  In other words, the argument appears to go, because the Government had already uncovered substantial evidence about the criminal conspiracy that led it to Target Telephone One and Gonzalez, it should not be afforded the leeway Scott provides to avoid minimization as the wiretap first gets underway and agents are attempting to understand the scope of the conspiracy.

This argument fails, however, for the simple reason that the wiretap applications and Orders make clear that, at the time these challenged communications were being intercepted, agents were still attempting to understand who was involved in the conspiracy.  Indeed, as the wiretap progressed, the Government was returning to the court with more individuals it had probable cause to believe were associated with Gonzalez's alleged illicit activities.  For instance, while neither Salgado nor Cancel were

listed as violators or interceptees in the initial application, Salgado was added as both a violator and an interceptee in the Government's December 12, 2019 application after text messages intercepted in the first thirty days of the wiretap indicated that she and Gonzalez would text "about their children", but also "regarding narcotics trafficking activities."  Gov't's Hearing Ex. 4 at 8.  Similarly, Cancel was added as a violator and an interceptee in the January 13, 2020 application after the previous thirty days of wire intercepts over Target Telephone One had revealed he and Gonzalez were "discussing narcotics-related activities."  Gov't's Hearing Ex. 7 at 9.  This was also true for other associates of Gonzalez: while Judge Chatigny found probable cause to list fifteen individuals as violators in relation to the wiretap in the first Order, that number had ballooned to twenty-eight by February when Judge Shea signed the final Order.  See Gov't's Hearing Ex. 1; Gov't's Hearing Ex. 10.  The sheer magnitude of the conspiracy, coupled with the contemporaneous evidence in the record suggesting that agents were actively identifying additional individuals who may have been involved as the wiretap progressed, militates in favor of a finding that the agents did not act unreasonably in intercepting communications early on as they attempted to map the scope of the criminal enterprise.

Similarly, Gonzalez's challenges to communications with individuals listed as violators or interceptees in the Orders falls short.  Setting aside the fact that many of these communications included information relevant to the investigation, it is perfectly reasonable that monitoring agents would be slower to minimize calls and texts between Gonzalez and the very people he was alleged to be conducting illicit activities with over the course of the wiretap.  The same is true, though perhaps to a lesser extent, for

communications with known associates where narcotics activity is discussed.  And, as

Gonzalez discussed information relevant to the investigation – e.g., illicit activities, his

location, and travel – with unidentified associates, it was reasonable for the Government

to mark those communications as pertinent as well.

For these reasons, the court concludes that the communications in Categories B,

C, D, O, and Q were not intercepted in violation of the minimization requirement.

4.      Communications Related to Motor Vehicles and Gonzalez's
         Business (Category K)

Perhaps the most contentious category of challenged communications are those

related to what Gonzalez says was his "legitimate business in auto sales."  Def.'s Mem.

at 14.  While Gonzalez argues that all the communications related to this business,

Primetime Auto, were improperly intercepted, the Government counters by arguing that

this category – which it labels as Category K – was highly relevant to its investigation

because Gonzalez allegedly used it to "facilitate his narcotics trafficking and money

laundering activities."  Gov't Hearing Ex. 14.  In addition, TFO Poulin testified that

Gonzalez and his associates would often use car-related slang terms to describe drug

quantities, making it all the more difficult for agents to cleanly delineate between

narcotics-related and auto-related conversations.  See Hearing. On this issue, the court

agrees with the Government.

First, TFO Poulin's testimony related to Primetime Auto is sufficient for the court

to conclude that, in light of the facts and circumstances available to the agents at the

time, it was not unreasonable for them to intercept the communications in Category K.

According to TFO Poulin, a confidential informant had provided information to the

Government indicating that Gonzalez may have had an ownership stake in Primetime

Auto.  Id.  Over the course of the investigation, agents came to suspect that Gonzalez and his associates were laundering money through Primetime Auto as well – indeed, the wiretap Orders list money laundering and conspiracy to commit money laundering as offenses for which there was probable cause to believe the violators had committed. Id.; see, e.g., Gov't's Hearing Ex. 1.

The Government also suspected that Gonzalez was using car-related code words to describe drug quantities.  For instance, in TFO Poulin's Affidavit in support of the February 11, 2020 Order, he described a conversation between Gonzalez and another one of his co-defendants in this case.  See Gov't's Hearing Ex. 10 at 37.  In that conversation, the associate had texted Gonzalez that "a new vehicle ha[d] arrived" for him if he was interested.  Id.  Based on that conversation and Gonzalez's history of using similarly coded language, TFO Poulin believed that a "new vehicle" was a reference to a new drug shipment of one or more kilograms of narcotics, likely fentanyl. Id.  In the hearing, TFO Poulin testified that Gonzalez was usually not overt when communicating about narcotics-related activity; instead, he and his associates would use coded language, such as talking about "work" when referencing his illicit activities or discussing "cars", "tires", and "rims" as quantities of narcotics.  See Hearing.

Taken together, agents were faced with difficult circumstances in deciding whether or not to minimize calls in which Gonzalez was discussing his business and cars more generally.  Not only did they suspect he was using Primetime Auto to launder drug proceeds, they also believed he was using language shrouded in car-related lingo to describe his illicit activities.  Given this complexity, the court cannot conclude that the

Government acted unreasonably in declining to minimize the calls in Category K challenged by Gonzalez.

>    5.    Narcotics activities, stash locations, firearms, financial activities, and other criminal activity (Categories I, J, L, and N)

In Categories I, J, L, and N, the Government points to communications challenged by Gonzalez that it argues are directly related to narcotics activities, stash locations, firearms, financial activities, and other criminal activity.  After a careful review of each communication in these categories, the court agrees with the Government that, generally, it was reasonable for agents to believe that these communications – whether in isolation or in the context of other intercepted communications – directly pertained to the investigation, Gonzalez's finances, or other possible criminal activity.

>    6.    Miscellaneous Categories (Categories E, M, F, H, and P)

Finally, Gonzalez also challenges communications with telephone service providers or about his phone use (Category E); communications related to his location and the locations of his associates (Category M), including messages from Uber and Lyft related to his movements (Category F); and, generally, communications that require additional context to discern their relevance (Category H) and others where the monitoring agents were not able to quickly determine they were not relevant at the time the communication occurred, in light of the complexity of the investigation (Category P).

After a careful review of the communications in these categories, the court cannot conclude that the Government acted unreasonably in intercepting them.  As TFO Poulin testified in the hearing, communications in Categories E, M, and F were especially relevant in light of the fact that the Government had reason to believe Gonzalez was using multiple cars and locations to facilitate his illicit activities, and to

36

ensure that Gonzalez continued to use Target Telephone One for those purposes.  See Hearing.  For the reasons already articulated by the court, see supra Section III.C, many of the communications in Category H – in particular the text messages – required additional context from other communications to discern.  And, in light of the Scott factors, the significant complexity of this case, and the frequent use of coded language, it is understandable that the relevance of some of the communications in Category P were not readily identifiable to monitoring agents intercepting those communications in real time, especially when many of the communications in that category occurred between Gonzalez and other violators or interceptees listed in the court Orders.

As such, the court cannot conclude that the Government acted unreasonably in not minimizing the communications in Categories E, M, F, H, and P.

### 7.    Conclusion

"[N]o electronic surveillance can be so conducted that innocent conversation can be totally eliminated."  Bynum, 485 F.2d at 500.  In assessing whether the minimization requirement was violated, courts should not "blind[ly] rel[y]" on the percentage of non-pertinent communications that were intercepted, but instead make its determination based on "an objective assessment of [the Government's] actions in light of the facts and circumstances" known to it at the time the communications were intercepted.  Scott, 436 U.S. at 137, 140.  In evaluating the reasonableness of the Government's actions, courts must also keep in mind that "[t]he statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations."  Id. at 140.

Here, the Government represents that it minimized 60 phone calls and 154 text messages over the course of the wiretap.  Gov't Supp. Resp. at 1.  It has also

provided reasonable explanations for each of the communications it did not minimize.

Taken as a whole, the court concludes that, in light of the facts and circumstances

available to the Government at the time the wiretap was in place, its decisions not to

minimize the challenged communications were not unreasonable.

**V.     CONCLUSION**

For the reasons discussed above, the Motion to Suppress is denied.

**SO ORDERED.**

Dated at New Haven, Connecticut this 4th day of January 2022.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge